## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Aug 17 2015, 8:28 am
Kevin S. Smith
**CLERK**
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

---

## IN THE
# COURT OF APPEALS OF INDIANA

---

James Pitman,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

August 17, 2015

Court of Appeals Case No.
49A04-1501-CR-5

Appeal from the Marion Superior Court

The Honorable Mark Stoner, Judge

Cause No. 49G06-1404-FB-20163

**Vaidik, Chief Judge.**

# Case Summary

[1] James Pitman was convicted of Class B felony rape, Class B felony criminal deviate conduct, Class D felony criminal confinement, Class D felony

intimidation, and Class A misdemeanor domestic battery for raping, battering, and confining his live-in girlfriend.  He now appeals his convictions, arguing that the arresting officer impermissibly vouched for the State's witnesses, which constitutes fundamental error.  However, the officer did not testify that he believed the victim or the victim's co-worker that the victim had been texting during the ordeal nor did the officer express an opinion as to the truth of their statements.  Rather, the officer merely explained—in response to defense counsel's question—that he arrested Pitman based on the statements of the victim and her co-worker, the victim's visible injuries, and the fact that Pitman had nothing to say to contradict the victim's statements to police.  Accordingly, we conclude that the trial court did not commit error, let alone fundamental error, in admitting the officer's testimony.  We therefore affirm Pitman's convictions.

# Facts and Procedural History

[2]     The facts most favorable to the verdict reveal that James Pitman lived with his girlfriend, F.N., and her three children.  In the early-morning hours of April 18, 2014, Pitman returned home intoxicated after drinking with a friend.  Tr. p. 43, 283.  F.N. woke up around 3:45 a.m. to the sound of Pitman stumbling around the house.  As Pitman lay down, F.N. got up and started to get ready for work.  F.N. had to leave earlier than usual to pick up a co-worker, and she did not want to deal with Pitman "because [she] could tell he [had been] drinking."  *Id.* at 46.  As F.N. was getting dressed in the bathroom, she heard Pitman grab her

keys and ask what she was doing. *Id*. at 47-48. F.N. told Pitman she was getting ready for work. After getting dressed, F.N. went to take her keys from Pitman, who was sitting on the bed. When she leaned over, Pitman "lean[ed] up" toward her and started punching her in the face. *Id*.

[3] After Pitman hit F.N. several times, she went to the bathroom to wash off the blood. When F.N. told Pitman she had to go to work, Pitman responded that she could not go to work looking like that. *Id*. at 49. So F.N. called her employer and left a voice message that she would not be at work that day. F.N. told Pitman she needed to call her co-worker—David Thompson—to let him know she could not take him to work. In response, Pitman took her phone, threw it down, and told her she "needed to get in the shower, [and] that [she] was his." *Id*. at 51. Although F.N. said she did not need to get in the shower, Pitman threatened that if she did not get in the shower, he would "bash" her head into the wall. *Id*. F.N. immediately got in the shower. After F.N. got out of the shower, dried off, and put on a T-shirt and shorts, she left the bathroom and walked through the bedroom. As she walked through the bedroom, Pitman shoved her onto the bed. *Id*. at 52. Pitman tried to pull F.N.'s shorts down, but F.N. kept trying to pull them back up. *Id*. at 54. F.N. asked Pitman to stop, but he refused. *Id*. When Pitman attempted to perform oral sex on F.N., she kicked him. He then bit her vaginal area. *Id*. at 54-55. F.N. continued to tell Pitman to "stop," but he refused. *Id*. at 55. Pitman then got on top of F.N. and inserted his penis in her vagina and engaged in sexual intercourse with her against her wishes. *Id*. at 55-56.

[4] Although Pitman fell asleep, F.N. did not leave because she was afraid if she tried to leave he would just stop her. *Id.* at 57. When Pitman woke up a couple hours later, F.N. told him she was hungry. Pitman got up and left the room to fix F.N. something to eat. *Id.* at 59, 95.

[5] During the course of the morning, F.N. texted her co-workers Robin Miller and Thompson that she had a broken nose, Pitman had punched her in the face, he would not let her leave, and he raped her. *See id.* at 59, 88, 97; *see also* State's Ex. 7, 16 ,17, 18.

[6] After receiving F.N.'s texts, Robin drove to F.N.'s house and called 911 from outside. Tr. p. 128-29. Officers Matthew Addington and John Reichle of the Indianapolis Metropolitan Police Department were dispatched to 2231 Canvasback Drive around 10:30 a.m. for a domestic-related assault. *Id.* at 20-21, 31. Officer Addington arrived first and waited for Officer Reichle. *Id.* at 19-20. While he was waiting, Officer Addington was approached by Robin on the street and had a conversation with her. Once Officer Reichle arrived, both officers went to the door and knocked. Pitman answered the door after several minutes. *Id.* at 35. Officer Addington informed Pitman that they "were trying to confirm or dispel that an assault had occurred and [would] like to see all parties in the house." *Id.* at 22-23. Pitman led Officers Addington and Reichle to F.N., who was in the master bedroom. *Id.* at 24. F.N. had lacerations and bruising on her forehead, and the bridge of her nose was cut open. *Id.*; *see also* State's Ex. 1, 2, 3, 4. Pitman had no visible injuries. Tr. p. 32. After Officer

Riechle took Pitman outside, F.N. told Officer Addington that Pitman was responsible for the injuries to her face. *Id*. at 25-26.

[7] Officer Addington radioed Officer Reichle to handcuff Pitman. Pitman asked Officer Addington "what [F.N.] had said." *Id*. at 29. Pitman did not say anything else about what had happened. Officer Addington arrested Pitman for domestic battery, battery, and criminal confinement. *Id*. at 36. F.N. was taken to Indiana University (IU West) hospital because of a possible concussion. *Id*. at 26, 30, 32. After being examined at IU West, F.N. was transported to the Center of Hope at Methodist Hospital. F.N. informed a forensic-nurse examiner that she had been raped and consented to a sexual-assault examination. *Id*. at 168, 173. The test results revealed traces of Pitman's semen and DNA in her vaginal area, on a maxi pad, and in her underwear. *Id.* at 221-26, 257-61.

[8] The State charged Pitman with Count I: Class B felony rape; Count II: Class B felony criminal deviate conduct; Count III: Class D felony criminal confinement (for holding F.N. down); Count IV: Class D felony criminal confinement (for not allowing F.N. to leave); Count V: Class D felony intimidation; Count VI: Class A misdemeanor domestic battery; and Count VII: Class A misdemeanor battery.[1] Appellant's App. p. 44. At Pitman's jury

---

[1] Originally Count III was Class D felony sexual battery. The State, however, filed a motion to amend the information and deleted Count III on November 24, 2014. Appellant's App. p. 43. The court granted the motion, and the charges in the information were renumbered to be sequential. *Id*. at 44.

trial, defense counsel asked Officer Addington on re-cross why Pitman was arrested on the scene. Officer Addington responded:

> After conducting what I thought was enough for a charge that met the statute of Domestic Battery and Battery, Criminal Confinement and the fact that Mr. Pitman had nothing to say about the assault itself. I wanted to know what she said possibly to formulate a lie to me. I went ahead and arrested based on that. Also the testimony from a witness or a friend, [Robin], on the lead-in information that she gave me initially, and also from [F.N.] and her injuries, that was [affirmative] occurrence of an assault.

Tr. p. 36. Defense counsel did not object to Officer Addington's response. *Id*. Pitman testified in his own defense that F.N. hit him first and after a few hits he "snapped" and hit her back. *Id*. at 285-88. Pitman also testified that the sexual intercourse was consensual. *Id*. at 302-04. The jury found Pitman guilty as charged. *Id*. at 373-74. The trial court entered judgment on all counts except Counts III and VII on double-jeopardy grounds.[2] The court imposed concurrent sentences of twelve years each, with six years suspended, for Counts I and II; three years each on Counts IV and V; and one year for Count VI. Appellant's App. p. 11-13; Tr. p. 430. This resulted in an aggregate sentence of twelve years with six years suspended, to be served in the Indiana Department of Correction.

[9]     Pitman now appeals.

---

[2] The court merged Count III: criminal confinement, with Count I: rape; and Count VI: domestic battery, with Count VII: battery.

# Discussion and Decision

[10] Pitman contends that the trial court erred in admitting Officer Addington's testimony concerning why he arrested Pitman on the scene because it impermissibly vouched for the State's witnesses. Because Pitman did not object to Officer Addington's testimony at trial, he argues that it amounts to fundamental error.

[11] Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to "make a fair trial impossible." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014) (quotation omitted), *reh'g denied*. In other words, to establish fundamental error, the defendant must show that, under the circumstances, the trial judge erred in not sua sponte raising the issue because the alleged errors (a) "constitute clearly blatant violations of basic and elementary principles of due process" and (b) "present an undeniable and substantial potential for harm." *Id.* (quotation omitted). The element of such harm is not established by the fact of ultimate conviction; rather, it "depends upon whether [the defendant's] right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he otherwise would have been entitled." *Id.* (quotation omitted). In evaluating the issue of fundamental error, our task is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury— including evidence admitted at trial, closing argument, and jury instructions— to determine whether the misconduct had such an undeniable and substantial

effect on the jury's decision that a fair trial was impossible. *Id.* Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred; it is not meant "to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Id.*

[12] Pitman argues specifically that Officer Addington's testimony that he arrested Pitman "based in part on the statements of [F.N.] and the 'testimony' of [Robin]" was impermissible vouching testimony in violation of Indiana Evidence Rule 704 (b).[3] Appellant's Br. p. 7. Evidence Rule 704 (b) provides that "witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Such testimony is an invasion of the province of the jurors in determining what weight they should place upon a witness's testimony. *Bean v. State*, 15 N.E.3d 12, 18 (Ind. Ct. App. 2014), *trans. denied*; *Gutierrez v. State*, 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012). It is essential that the trier of fact determine the credibility of the witnesses and the weight of the evidence. *Gutierrez*, 961 N.E.2d at 1034.

---

[3] Pitman does not argue that Officer Addington's testimony was impermissible course-of-investigation evidence. *See Blount v. State*, 22 N.E.3d 559, 565 (Ind. 2014) ("The core issue at trial is, of course, what the *defendant* did (or did not do), not why the *investigator* did (or did not do) something. Thus, course-of-investigation testimony is excluded from hearsay only for a limited purpose: to bridge gaps in the trial testimony that would otherwise substantially confuse or mislead the jury." (quotation omitted)).

[13]     Here, defense counsel—not the State—asked Officer Addington why he arrested Pitman on the scene, and the officer answered by giving the facts that led him to make the arrest. This is not vouching. Instead, vouching occurs when a witness testifies or opines that what another person has said is true or that he believes her. *See id.* at 1033-35 (holding that the sexual-assault nurse's testimony that she "believe[d]" that the victim was telling the truth and the case manager's testimony that she "absolutely" believed what the victim had said constituted impermissible vouching testimony). Officer Addington did not testify that he believed F.N. or Robin nor did he express an opinion as to the truth of their statements. Instead, Officer Addington merely explained—in response to defense counsel's question—that he arrested Pitman based on the statements of F.N. and Robin, F.N.'s visible injuries, and the fact that Pitman had nothing to say to contradict F.N.'s statements. *See* Tr. p. 24, 26, 32, 36. In essence, Officer Addington explained the basis of his probable cause to arrest Pitman. An officer's testimony explaining the facts as to why he arrested someone cannot be considered as asserting a personal belief that a victim or witness is credible or telling the truth. Officer Addington did not say that the crime happened; rather, he said that there was probable cause to believe that the crime happened. Officer Addington did not vouch for the State's witnesses.

[14]     Also, the fact that Officer Addington referred to Robin's statements as "testimony" does not somehow convert his statement into vouching. *See* Appellant's Br. p. 9 ("Although [Officer] Addington referred to the statements of [Robin] as 'testimony,' it was, in fact, unsworn hearsay."). It is clear from

the context that Officer Addington was referring to what Robin told him when she approached him on the scene. Therefore, there was no danger that the jury believed he was referring to a sworn statement given in court or that he was commenting on what Robin would say in court later during trial.

[15] Because Officer Addington did not vouch for the State's witnesses, we conclude that the trial court did not commit error, let alone fundamental error, in admitting his testimony.[4] We therefore affirm the trial court.

[16] Affirmed.

Robb, J., and Pyle, J., concur.

---

[4] Pitman makes two additional arguments. First, he argues that the "error in admitting the vouching testimony was compounded by the officer's improper statements casting doubt on Pitman's credibility." Appellant's Br. p. 9. In support, Pitman points us to this testimony from Officer Addington: "I wanted to know what *she* said possibly to formulate a lie to me." Tr. p. 36 (emphasis added). "She" is a clear reference to F.N. But in his analysis, Pitman argues that the officer "voic[ed] his suspicion that *Pitman* may have been 'formulat[ing] a lie' to police" and "portrayed *Pitman* as a calculating liar." Appellant's Br. p. 9 (emphases added). Because Pitman did not give a statement to police and only asked the officer what F.N. had said, we find that the officer's statement was not a reference to Pitman, much less a reference to his credibility.

Second, Pitman argues that although "[Officer] Addington referred to the statements of [Robin] as 'testimony,' it was, in fact, unsworn hearsay." *Id.* We find this argument waived for failure to support it by cogent reasoning and citations to authority. *See* Ind. Appellate Rule 46(A)(8)(a).